South Porto Rico Sugar Company, Petitioner, *v.* Puerto Rico Sugar Board, Respondent.

No. 11. Argued November 9, 1955.—Decided April 30, 1956.

James R. Beverley, R. Castro Fernández, José López Baralt, and *Francisco Castro Amy* for petitioner. *Alejandro Romanace* for the respondent Board.

MR. JUSTICE MARRERO delivered the opinion of the Court.

On September 20, 1954, the Sugar Board of Puerto Rico addressed a letter to the South Porto Rico Sugar Company [1] notifying it that after making an examination it appeared that the sales which it had made to the Commercial Molasses Corporation and Commercial Solvents Corporation of the molasses it had produced in the 1952 crop season, had not been made in accordance with the supply and demand, as required by the Sugar Act of Puerto Rico, with the exception of the contract of April 17, 1952, whereby the Central sold to the Commercial Solvents Corporation one million gallons at fourteen cents per gallon; that from an analysis made by the Board pursuant to the provisions of § 5 II($b$) of the Act, it appeared that the average price for the molasses of all the Puerto Rican centrals from the crop season of that year was $0.105540 per gallon, while the average price of the sales of that product made by the South Porto Rico Sugar Company during the said crop season was $0.104110 per gallon—in both cases in factory tanks, excluding excise taxes—which represented a difference of $0.001430 in the average price per gallon for that season; and that in view of that result it was ordered to liquidate to the *colonos* the additional amount of $5,531.11, in the proportion corresponding to each of them.

---

[1] We will hereafter refer to the South Porto Rico Sugar Company simply as "the Central" or as "the petitioner."

The Central promptly moved for reconsideration of that order. After a hearing, at which petitioner offered oral and documentary evidence, the Board dismissed the motion on December 6, 1954. In the order entered to that effect it made the following findings of fact:

"1. That the production of blackstrap molasses of the South Porto Rico Sugar Company for the 1952 crop season was 5,860,484 gallons, as it appeared from the report submitted by the Central.

"2. That almost the entire amount of molasses produced by the Central during that crop season was sold under four contracts executed in February, March, and April 1952, and January 1953.

"3. That the supply and demand price in the Puerto Rican open market on the date of the contract entered into by the Central and the Commercial Solvents—March 24, 1952—was 17.547 cents per gallon, as correctly pointed out by the Central's attorney in his brief, but that the general average was obtained by taking as a basis the price of 17.547 cents per gallon rather than 19.5 cents per gallon of that sale, as erroneously notified in our order of September 20, 1954.

"4. That the price at which the Central sold 815,282 gallons of molasses to the Commercial Solvents Corporation under the contract of March 24, 1952, was 15.569 cents per gallon.

"5. That under the contract of February 28, 1952, between the Central and the Commercial Molasses Corporation, there were sold 5,500,000 gallons of blackstrap molasses, it being provided in the contract that the price would be determined by dividing the total amount of molasses sold in four equal parts, as follows:

"Twenty-five percent shall be liquidated at the average price of the Cuban blackstrap molasses sold by the Institute for the Stabilization of Sugar of Cuba during the quarter from April to June 1952; 25 percent at the determined average price of each of the remaining two quarters of 1952; and 25 percent at the determined average price of the first quarter of 1953 of the sales made by the Stabilization Institute of Cuba.

"6. That by letter of May 25, 1954, the South Porto Rico Sugar Company reported that, due to the difficulties in obtain-

ing exact prices of the sales of Cuban molasses sold quarterly, an agreement was reached with the Commercial Molasses as respects the prices to be paid, but such information was erroneous because, according to the evidence submitted thereafter at the hearing by the South Porto Rico Sugar Company, as disclosed by Exhibits 1 to 11 inclusive, the 1952 molasses was sold in accordance with the terms of the contracts entered into on the basis of the determined averages of the Cuban sales during the quarters of April to June, July to September, and October to December 1952, and the first quarter of 1953.

"7. That the average price of the sales of molasses of all the Puerto Rican centrals in Puerto Rico and in New York was $0.105540 per gallon, in factory tanks, for the 1952 crop season, excluding excise taxes.

"8. That the average price of the sales of molasses of the South Porto Rico Sugar Company for the 1952 crop season was $0.104110 per gallon, in factory tanks, excluding excise taxes.

"9. That the South Porto Rico Sugar Company sold its molasses of the 1952 crop season at $0.001430 per gallon below the average price of the sales of all Puerto Rican centrals during that season."

Thereupon the Central appealed to this Court under the authority of the provisions of § 33 of the Sugar Act of Puerto Rico—No. 426 of May 13, 1951, Sess. Laws, p. 1138; 5 L.P.R.A. § 402.

By order of December 15 of that year we ordered the petitioner to file in this court, within the following 15 days, a certified copy of the original record of the case. This was done. Petitioner's main contention is that, according to § 5 II(b) of the Sugar Act, "it appears clearly . . . that the Central is bound to liquidate the *colono's* share of the molasses on the basis of the average price in the molasses market determined by the Board, taking into consideration the sales made by all the Puerto Rican centrals in the local market and in the New York market, *only where the Central 'has not sold its molasses as a result of the supply and demand in the open market but, on the contrary, has sold*

*said molasses in such manner or to such entities or persons, that said sale has resulted unfairly prejudicial to the colonos.'* In other words, if the Central has sold its molasses as a result of the supply and demand in the open market, the Sugar Board is without power to determine and bind the Central to liquidate at the average price in the molasses market, regardless of whether such average price is greater than the price at which the Central sold its molasses." To this the respondent answered that, "from the Board's viewpoint, what § 5 II(*b*) does is merely to vest the Board with power to impose a penalty on the Central whenever the latter has sold its molasses at a price lower than the supply and demand price at the date on which the sales were made . . ." The question therefore involves one single problem: the interpretation to be given to the oft-mentioned § 5 II(*b*). This section in its pertinent part provides:

"II. *Blackstrap Molasses.*
"  .    .    .    .    .    .    .    .

"(*b*) The Board shall examine the sales of molasses of each central during the year, and if, as a result of such examination, the Board shall determine that any central has not sold its molasses as a result of the supply and demand in the open market but, on the contrary, has sold said molasses in such manner or to such entities or persons, that said sale has resulted unfairly prejudicial to the *colonos*, the Board is hereby empowered to determine the average price on the molasses market, taking into consideration the sales made by all the centrals of Puerto Rico in the local market and in the New York market, and on the basis of such average price, the central shall be bound to liquidate the *colono's* share of said molasses." 5 L.P.R.A. § 374.

In our opinion, the context quoted is crystal-clear. According to the context, it is the Board's duty to examine the sales of molasses of every central during the year. If from that examination it concludes that any central has not sold its molasses in accordance with the supply and demand in the open market *but, on the contrary*, has made its sales

in such manner that they have resulted *unfairly prejudicial to the colonos*, then, and only then, is the Board empowered to determine the average price in the molasses market, taking into consideration the sales of that product by all Puerto Rican centrals in the local market as well as in the New York market, and, on the basis of such average price, to order the central to comply with the obligation to liquidate the *colono's* share in the molasses.

The record shows that the Board examined petitioner's molasses sales and that it determined the average price for that product during that year, taking into consideration the sales made by all the centrals in this Island in the local market as well as in the New York market. However, it does not appear at all that "on the contrary" the petitioner had sold its molasses "in such manner or to such entities or persons" that its sales have resulted "unfairly prejudicial to the *colonos*." In view of the failure to comply with this requirement *sine qua non* of the Act, the order of the Board can not be upheld.

As already stated, at the request of the South Porto Rico Sugar Company for reconsideration of the order of September 20, 1954, the Board held a hearing at which the Central produced oral and documentary evidence. The oral evidence consisted of the testimony of Antonio Miró Sojo, who testified, among other things, that he is engaged in the purchase and sale of molasses at wholesale and that he has been in the business some 16 years; that in the past years Puerto Rico has been guided by the Cuban prices; that there have been instances in which Cuba has sold cheaper to England than to the United States, and that Puerto Rico must do business in accordance with the prices and shipping facilities prevailing here; that everything depends on the production of molasses and on the tankers available for the transportation of molasses; that Cuba supplies about 40 or 45 percent of the molasses used in continental United States;

that the sale of Cuban molasses in the United States is what regulates the price; that in the molasses business it is customary to sell at the average price for the quarter; that many are compelled to sell for lack of storage facilities; that the Cuban price covers the entire market, but does not establish it as to Puerto Rico because of the difference in freightage; that lately the purchasers have acquired Puerto Rican molasses on the basis of the Cuban price; and that the molasses business is unstable and speculative, and that he sustained a loss of over $300,000. The documentary evidence consisted, among other things, of the contracts entered into between the petitioner and the Commercial Molasses Corporation and the Commercial Solvents Corporation, covering the molasses herein involved. It was also stipulated that the petitioner only has storage facilities for approximately one half of its annual molasses output.[2]

There was no evidence before the Board to rebut that offered by petitioner. It is unquestionable that, in view of such situation, the evidence offered by it should have been believed. See *Comm'r of Education* v. *District Court; Feliciano, Int.*, 74 P.R.R. 306, 319. Yet, evidently it was not believed.

Be it as it may, § 5 II(*b*) requires, as already noted, that from the examination made by the Board it should appear that the Central has not sold its molasses as a result of the supply and demand in the open market but, on the contrary, that it has sold it in such manner that the sales resulted unfairly prejudicial to the *colonos*. That unfair prejudice was lacking in this case. The Spanish version of § 5 II(*b*) employs the copulative conjunction "y" rather than the dis-

---

[2] The respondent in its brief admits that "in times of peace . . . the molasses market becomes a buyers' market and, since Puerto Rico does not have sufficient storage facilities to store the entire molasses output, it becomes necessary and indispensable to sell early in the season, and, hence, certain purchasers in the United States take advantage of this to bring down the prices."

junctive conjunction "o" in the phrase "*y, al contrario.*" *
Hence, the need for complying with this requirement is imperative.

The order entered by the respondent Board on September 20, 1954, as well as its order of December 6 of the same year, will be set aside.

Mr. Justice Sifre did not participate herein.

Mr. Justice Saldaña concurs in the result.

---

\* The English version employs the phrase "but, on the contrary."